# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39962**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Katelyn L. DAY**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 5 January 2022

————————————

*Military Judge:* Bryan D. Watson (arraignment); Jefferson B. Brown (trial); Andrew R. Norton (post-sentencing).

*Sentence:* Sentence adjudged on 23 July 2020 by GCM convened at Barksdale Air Force Base, Louisiana. Sentence entered by military judge on 26 August 2020: Dishonorable discharge, confinement for 10 years, and reduction to E-1.

*For Appellant:* Major Matthew L. Blyth, USAF.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Captain Cortland T. Bobczynski, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, KEY, and MEGINLEY, *Appellate Military Judges*.

Judge MEGINLEY delivered the opinion of the court, in which Chief Judge JOHNSON and Senior Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

MEGINLEY, Judge:

A general court-martial composed of a military judge sitting alone convicted Appellant, in accordance with her pleas and pursuant to a plea agreement, of one specification of attempted wrongful possession of fentanyl and one

specification of attempted premeditated murder, both in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880; an additional charge with one specification of attempted conspiracy to commit premeditated murder, also in violation of Article 80, UCMJ, 10 U.S.C. § 880; another additional charge with two specifications of solicitation to commit murder, in violation of Article 82, UCMJ, 10 U.S.C. § 882; and a second additional charge with one specification of attempted conspiracy to commit murder in violation of Article 80, UCMJ, 10 U.S.C. § 880. The military judge sentenced Appellant to a dishonorable discharge, confinement for ten years, and reduction to the grade of E-1. The convening authority took no action on Appellant's sentence.[1]

Appellant raises four issues on appeal: (1) whether Appellant's plea of guilty to two specifications of attempted conspiracy is improvident as the specifications failed to state an offense, or, in the alternative, whether the military judge abused his discretion in accepting Appellant's plea to attempted conspiracy because Appellant did not perform a substantial step towards the commission of the offense; (2) whether the military judge's ambiguous language during Appellant's providence inquiry rendered Appellant's plea to solicitation to commit murder improvident; (3) whether Appellant's plea to attempted murder was improvident because the overt act was not a substantial step towards commission of the offense, and even if the overt act was sufficient, Appellant did not have the requisite mens rea at the time she performed the overt act; and (4) whether Appellant's sentence is inappropriately severe.[2] We have carefully considered issues (2) and (3) and determine they are without merit and warrant no discussion or relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We find no error that has materially prejudiced the substantial rights of Appellant, and affirm the findings and sentence.

## I. BACKGROUND

Appellant joined the Air Force in April 2016 and at the time of her offenses, was stationed at Barksdale Air Force Base, Louisiana. As part of her plea

---

[1] All offenses occurred on or after 1 January 2019. Thus, all references to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial*, *United States* (2019 ed.). Further, the Military Justice Act of 2016, National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 5001–5542 (23 Dec. 2016), as fully implemented by Exec. Order 13,825, 83 Fed. Reg. 9889 (8 Mar. 2018), applied to Appellant's court-martial and post-trial processing. Appellant was credited with 218 days of pretrial confinement credit.

[2] Appellant's second, third, and fourth assignments of error are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

agreement, Appellant agreed to a stipulation of fact which forms the basis for the following factual background.

Appellant met her husband, TD, while both were in an outpatient treatment program in Shreveport, Louisiana. Shortly after meeting each other, Appellant and TD began a romantic relationship, and married in July 2017, two months after they met. Unbeknownst to Appellant, TD was also in an on-again, off-again relationship with JM, with whom he was expecting a child. Two weeks after getting married, Appellant learned that TD and JM were expecting a child, who was born in late July 2017.

After getting married, Appellant added TD as a dependent in the Defense Enrollment Eligibility Reporting System and secured a $100,000 life insurance policy on TD through the Family Servicemember's Group Life Insurance Program (FSGLI). Appellant was aware that in the event of a divorce, she would no longer be able to hold life insurance over TD through FSGLI.

In December 2018, Appellant gave birth to the couple's only child. However, Appellant and TD's marriage was having problems, including problems related to money, in part because TD was only making minimum wage while working a part-time job. Although the couple went to marriage counseling, in February 2019 Appellant told TD she wanted to separate. In March 2019, TD moved out of their home and was ordered to pay child support, but was inconsistent in doing so. In April 2019, Appellant filed for divorce from TD. Because Appellant and TD had a child together who was under 18 years of age, under Louisiana law, they would have to live separate and apart, continuously for at least 365 days, before a judge could grant them a divorce.[3] After their separation, Appellant continued to experience money issues because of the lack of consistent child support from TD and because she was the sole supporter for their child. Additionally, Appellant was concerned that TD would take their child from her and she did not want TD to have custody.

Although their relationship was initially "rocky," by October 2019, Appellant and JM had "bonded over problems" they were both having with TD regarding custody, child support, and TD's visitation with the children. Appellant and JM both became involved in a four-person Facebook Messenger[4] group entitled, "Hot Mess Express," a conversation primarily about TD. At one point

---

[3] According to the stipulation of fact, Appellant and TD's divorce was initially considered a "no-fault" divorce. *See* LA. CIV. CODE. ANN. art. 103.1 (2018). For additional context, the court notes that in Louisiana, under LA. CIV. CODE. ANN. art. 103 (2018), grounds for a fault-based divorce include adultery, whether the other spouse has committed a felony and has been sentenced to death or imprisonment at hard labor, and physical or sexual abuse of the spouse or a child of one of the spouses.

[4] Facebook Messenger is a social media messaging application.

in the conversation, Appellant stated, "if something happened to [TD] I could use that life insurance money." Appellant later stated,

> I cut [TD] out of my will. He literally gets nothing. But I don't think [TD] has a will and is still covered on my life insurance. That 100,000 would be real nice. Pay bills off and get a car we need. Put the rest away for [TD's child] later.

Appellant then stated, "A lot of the bills are ones [TD] racked up that I got stuck with."

On 10 October 2019, Appellant and JM communicated in a private Facebook Messenger text. After JM stated she hated TD, Appellant replied, "Me too." JM then stated, "Like I really hate him. I want to hit something lol [(laugh out loud)]." Appellant then stated, "Have someone kill him [ ] then we won't have to deal anymore. I'll give you half his life insurance." JM then asked, "Wait, you're on his life insurance?" Appellant responded, "He doesn't have a will and I have him covered." JM asked questions about TD being covered by Appellant's life insurance and Appellant responded, "Military let's [sic] you cover your spouse." JM then asked, "Why is he still covered tho? Y'all be so f*cking weird sometimes." Appellant then stated, "We're not divorced. Military doesn't recognize separation." JM responded, "I thought that sh*t was over with and y'all were just doing custody now." Appellant responded, "It hasn't been a year yet. . . . Sooooo if he dies before our divorce is final I get that money. . . . I changed my will that he doesn't get my money if I die. He actually gets nothing [ ]."

On 15 November 2019, Appellant messaged the "Hot Mess Express" group, "Y'all known (sic) an undertaker? I'm not kidding. To the person that hooks it up I'll split the life insurance."

On 19 November 2019, Appellant contacted SP, a former boyfriend by Facebook Messenger. Appellant asked SP if he could help her with something, stating, "This is some shady stuff so if you're not about it let me know before I tell you and you judge me [ ]." SP stated, "it depend[ed] on how shady." Appellant then responded, "Do you know a hit man or something[?] And yes I'm serious." SP responded, "Yeah this is Facebook and I doubt u will be talking about that on here. Plus u have my number why wouldn't u have texted me." Appellant replied, "Because my text can be subpoenaed and I can delete Facebook." Appellant asked SP to conduct the conversation over Snapchat. The next day, Appellant and SP spoke by Snapchat video, Appellant told SP about her problems with TD. SP later told investigators that, after this phone call, he "got the vibe that [Appellant] was trying to get him to kill [TD] for her," and that "he believed she was asking for support and whether he knew anyone who could do it."

Also in November 2019, Appellant talked to a co-worker, JJ, about her issues with TD. According to the stipulation of fact, Appellant told JJ something to the effect of, "I need my husband to go away." Unsure of Appellant's context, JJ responded, "Huh?" Appellant then essentially stated, "I will give you $50,000[.00], half of the insurance money, to kill him." JJ responded, "I'm not going to kill your husband. Get someone else to do that." Appellant told JJ she had contacted previous boyfriends to ask them to kill TD, but they told her they would not do it. JJ told Appellant, "There is no perfect crime. Don't you watch reality TV crime shows? You are going to get caught[.]" After some additional conversation, JJ stated he had to go. Appellant essentially replied, "Think about it[.]" The next week, Appellant approached JJ at work, and told him, "My husband has to die soon because his life insurance is about to run out[.]" JJ stated, "You are going to have to do it yourself, because no one else will[.]"

A couple days later, Appellant again approached JJ while both were on duty and handed him a piece of paper with TD's social security number, phone number, and address, along with his place of work and travel times. Appellant told JJ that TD would be coming back to Bossier City, Louisiana (outside of Barksdale AFB), to visit their child. During this conversation, Appellant told JJ "she wanted [TD] to believe she was having second thoughts about the divorce in order to prolong the divorce proceedings." Later that day, Appellant called JJ to let him know she purchased an item at a local store and asked if he would return it and use the money to buy her "livestock dewormer," as JJ had mentioned using livestock dewormer as a possible method to kill TD. JJ said he would not do so.

JJ and Appellant later had another conversation, where Appellant stated, "I'm trying to find someone to do it or I'll have to do it myself." JJ stated, "I am going to talk to you out of it." When Appellant asked why, JJ stated, "I thought you were just mad. Didn't think you would." During several of the conversations, Appellant referred to a bush in front of her house that she wanted removed; JJ understood the bush to be a euphemism for TD. Finally, on 30 November 2019, Appellant texted JJ letting him know she had a plan. At this point, JJ responded that he was going to call the police to report her. Appellant responded, "Oh wow. That's a real change in position. I won't talk to you anymore then." After the short text conversation, JJ contacted the Bossier Parish Sheriff's Office (BPSO) and informed them of what Appellant had stated and

that he believed TD's life was "in danger."[5] BPSO made contact with Appellant later that same day and asked her some questions. According to a message Appellant sent to her friend, SB, Appellant told BPSO she was having a normal divorce with custody issues, and that JJ was a friend who she had asked to assist her with cutting a bush in her yard.

Also on 30 November 2019, Appellant made contact with TL, an individual she knew previously, and asked for his assistance in her plan to murder TD.[6] When TL asked for clarification, Appellant responded, "My most recent thought was putting a bunch of muscle relaxers and pain pills in a drink of his. . . . Will it work?" TL responded, "No clue. I mean there are plenty of ways to overload the system for failure [you know]?" TL advised he could help Appellant in a certain way, "but only in ways that would teach you how the body works, ya kno[w]? Anything further is up to you." Appellant replied, "Okay. I have to give it some time but I need options or to find some drugs." Later that day, Appellant messaged TL asking him if he was going to teach her what she needed to know. TL responded, "Why don't you just pay me monthly. I guarantee [people] pay for sh*t that is way less important than knowledge lol [.]" Appellant responded, "You won't call the cops on me right? I just off the phone with some[one] because [they] wanted to snitch." TL responded, "What [are you] talking [about]? You need to chill.. talking to the wrong [people] then." During her providence inquiry, Appellant told the military judge she called TL on 16, 17, and 18 December 2019 to receive these lessons.

As their conversation progressed, TL told Appellant he would charge her $100.00 a month to teach her how to go through with her plan to murder TD by fatally poisoning him. Also, TL told Appellant, "U need to stop talking [about] it to anyone and even on here . . . sh*t is all recorded at a database.

---

[5] During her providency inquiry, in articulating why Appellant believed she was guilty of solicitation of JJ to commit murder, Appellant told the military judge,

> I approached [JJ], a civilian I work with, in person and asked him to help me kill [TD]. When I asked him, I offered him $50,000 for his help in either doing it himself or finding – or helping me find a way to kill [TD]. . . . At the time I asked [JJ] to help me kill [TD], I was serious and I specifically intended for him to be involved with killing [TD], that is, it was my intent for [JJ] to commit the actual unlawful premeditated murder of [TD] with my help. [JJ] understood I was serious because I continued to ask him for help in killing [TD]. By offering [JJ] $50,000, it was my specific intent to influence him to actually kill [TD] by whatever way he could. At no point did [JJ] agree to kill [TD].

[6] TL and Appellant also communicated by Facebook messenger. According to the timestamps of these messages, it appears Appellant contacted TL after she talked to BPSO.

Like if you're serious [about] this u need to go get a prepaid phone and I'll get one too."

By 15 December 2019, the Air Force Office of Special Investigations (AFOSI) became involved in this case, and on that same day, agents interviewed JM. JM agreed to assist the AFOSI and became a confidential informant. JM resumed her communications with Appellant on Facebook Messenger. After going back and forth on the custody and child support issues both were dealing with, JM asked Appellant, "[W]hat's up on that hitman?" Appellant responded, "Can't afford to even think about it hahah. You may know more people for it than I do." JM and Appellant continued their conversation and at one point, JM said, "Lol are we seriously thinking about doing it[?]." Appellant said, "If we are we need to take it off [Facebook]." JM and Appellant moved their conversation to Snapchat. When JM asked Appellant how she would drug TD, Appellant responded, "I thought [about] putting it in a drink. That's the only [safe] way maybe. [I don't know] man. I really don't. It's always a risk." JM asked what kind of drug Appellant would use, to which she responded, "Muscle relaxer and pain killers. If we put that in a drink before he was to drive.....??" A couple of messages later, JM told Appellant that she could "[probably] get her hand on some stuff." JM told Appellant, "It would only make sense for me to get the stuff and you put it in the drink because you're around him more than me."

JM then told Appellant they could "do it" for $100.00. The pair made a plan to meet in Ruston, Louisiana, about 65 miles from Barksdale AFB on 18 December 2019. Appellant asked JM, "You're not like going to turn this conversation and me over to the cops right? That's the last thing I need after the other person calling the cops on me[.] . . . We have everything to gain this way[,] I'm just paranoid because the other person called the cops on me." A few messages later, JM asked Appellant, "So are you sure you wanna do this[?]" Appellant responded, "I'll see him Saturday[.] And I have cash already so I'll just give it to you when we meet[.] I'm going to go off base to get him 'snacks for the road' and I'm going to wear gloves [so] that my prints won't be on anything[.]" JM and Appellant's conversation continued with Appellant noting specific energy drinks TD enjoyed, issues with custody, and the value of the life insurance policy against TD. Appellant stated she would give JM some of the proceeds, "Like 10-20 [thousand] if I can[ . . .] ." Appellant also talked about the kind of car she would buy with the proceeds. In concluding their conversation, they decided to meet up in Ruston at a local Walmart so Appellant could purchase the substance she would use to murder TD.

On 18 December 2019, JM met with AFOSI agents who provided her with a small package containing the substance Appellant would purchase from JM. AFOSI agents told JM that she was to tell Appellant that the substance was

fentanyl, a Schedule II controlled substance; however, the substance used in the buy was not actually fentanyl. Shortly after 1430 on that same day, JM and Appellant met at the Walmart, where JM gave Appellant a "clear baggy" containing a white substance in exchange for a $100 bill. The "baggy" was concealed in a box with other items. After the exchange, JM told Appellant that the substance was fentanyl and instructed Appellant, "Don't touch it. Don't do anything. Put on gloves." At that point, Appellant showed JM a pair of rubber gloves and mentioned her plan to use the gloves to buy the drinks and snacks used to poison TD. When JM asked how she was going to murder TD, Appellant stated, "I was going to put it in that [drink] and be like, 'Stay hydrated.'" Appellant told JM she was going to do it that following Saturday (three days later), as she was flying out on Sunday to go visit her family. JM asked Appellant how long would it take for the life insurance policy to pay out. Appellant stated, "the earliest is like six months." After additional conversation, Appellant attempted to look in the box provided by JM. JM told her, "[ ] [I]t's in there. As soon as you get home, open the box and it'll … You gotta rip it open ... Don't touch it. Don't sniff it. Put it in your freezer." Before they departed, JM asked Appellant, "You're for real gonna kill [TD]?" Appellant responded, 'Yeah. I don't want to say it out loud ... But before something actually happens, I don't, I'm not going to believe it's real until I get a phone call . . . ." After a few more comments, the two departed.

AFOSI agents surveilled and recorded the conversation between JM and Appellant. Once the transaction was complete, agents went back to Barksdale AFB, where Appellant lived on base, and they secured search authorization to search Appellant's home and automobile. That night, on 18 December 2019, agents entered Appellant's house, where they found the substance Appellant purchased from JM in her freezer; they also found rubber gloves. Agents then proceeded to interview Appellant. Under rights advisement, although she initially denied her plan to murder TD, she admitted believing the substance she acquired from JM was illegal, that she paid $100.00 for it, and that she had intended to put it in a drink and give it to TD on the following Saturday. Appellant did not know how fast the "fentanyl" would kill TD, but she felt sure TD would be dead by the following Monday. At the end of the interview, Appellant admitted her plan was to murder TD.

## II. DISCUSSION

### A. Military Judge's Acceptance of Appellant's Guilty Pleas

#### 1. Additional Background

Appellant argues her pleas of guilty to two specifications of attempted conspiracy were improvident as the specifications failed to state an offense, or, in

the alternative, that the military judge abused his discretion in accepting Appellant's plea to attempted conspiracy because Appellant did not perform a substantial step towards the commission of the offense. The two specifications at issue involve Appellant's interactions with JM (Additional Charge I and its Specification) and TL (Second Additional Charge and its Specification).

As Appellant agreed in the stipulation of fact, the elements of the Additional Charge I and its Specification related to JM are:

> 1) That, within the State of Louisiana, between on or about 1 December 2019 and on or about 18 December 2019, [Appellant] did [a] certain overt act[ ], that is: purchase from [JM], a substance to be used to kill [TD];
>
> 2) That the act was done with the specific intent to commit the offense of conspiracy to commit premediated murder of [TD];
>
> 3) That the act amounted to more than mere preparation, that is, it was a substantial step and a direct movement toward the conspiracy to commit the premediated murder of [TD]; and,
>
> 4) That such act apparently tended to bring about the commission of the offense of conspiracy to commit premediated murder to [TD], that is, the act apparently would have resulted in the actual commission of the offense of conspiracy to commit premediated murder of [TD] except for a circumstance which was unknown to Appellant which prevented completion of that offense.

*See also Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶¶ 4.b.(1)–(4).

The elements of Second Additional Charge and its Specification related to attempting to conspire with TL, and agreed upon by Appellant in the stipulation of fact, are the same as above, except that the first element is: that within the State of Louisiana, between on or about 1 November 2019 and on or about 18 December 2019, Appellant did certain overt acts, that is: agree to pay some amount of money to TL for lessons on how to fatally poison a human with drugs.[7]

---

[7] This specification as initially charged stated that "in order to effect the object of the conspiracy [Appellant] did agree to pay some amount of money to [TL] for lessons on how to fatally poison a human with drugs *and did purchase a substance she believed to be Fentanyl which she intended use to murder [TD]*." (Emphasis added). The military judge found Appellant's action of purchasing the fentanyl was not an overt act related

During Appellant's providence inquiry, she articulated why she was guilty of the offenses at issue and the military judge found her plea of guilty to these two offenses provident. As part of Appellant's plea agreement, she agreed to "waive all motions that are waivable under current legal precedent and public policy." The plea agreement also stated:

> In accordance with R.C.M. [Rule for Courts-Martial] 705(c)(1)(b), however, I understand I am not waiving the right to counsel, the right to due process, the right to challenge the jurisdiction of the court-martial, the right to a speedy trial, the right to complete sentencing proceedings and complete and effective exercise of post-trial and appellate rights.

The military judge reviewed all of the terms of the plea agreement with Appellant. On the issue of waiver, the military judge stated,

> The plea agreement also states that you waive or give up all waivable motions. I do advise you that certain motions are waived and are given up . . . . *Some of these could be motions to dismiss for lack of jurisdiction or failure to state an offense, those could not be waived.*

(Emphasis added).

The military judge asked Appellant, "Do you understand that this term of your plea agreement means you give up the right to make any motion which by law is given up when you plead guilty?" Appellant responded in the affirmative. The military judge then asked Appellant's counsel, what motions Appellant believed were waived "that [she] would otherwise raise in this case for this plea agreement[.]" Appellant's counsel then raised motions that she had considered raising; failure to state an offense was not a motion the defense would have raised.

### 2. Law

We review a military judge's decision to accept the accused's guilty plea for an abuse of discretion. *United States v. Riley*, 72 M.J. 115, 119 (C.A.A.F. 2013) (quoting *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008)). "An abuse of discretion occurs when there is 'something in the record of trial, with

---

to TL, as Appellant had decided on "a different path" separate from her agreement with TL to receive lessons on how to murder a human. As a result, the military judge found Appellant's plea to this portion of the specification improvident. Trial counsel did not present evidence supporting this part of the charge and the military judge ultimately found Appellant not guilty of the excepted language "and did purchase a substance she believed to be [f]entanyl which she intended to use to murder [TD]."

regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea.'" *Id.* (quoting *Inabinette*, 66 M.J. at 322).

It is a "general principle of criminal law that an 'unconditional guilty plea waives all nonjurisdictional defects at earlier stages of the proceedings.'" *United States v. Hardy*, 77 M.J. 438, 442 (C.A.A.F. 2018) (quoting *United States v. Lee*, 73 M.J. 166, 167 (C.A.A.F. 2014)).

"The military judge must ensure there is a basis in law and fact to support the plea to the offense charged." *United States v. Soto*, 69 M.J. 304, 307 (C.A.A.F. 2011) (citing *Inabinette*, 66 M.J. at 321–22) (additional citation omitted). In addition, the military judge must ensure the accused understands and agrees to the terms of any pretrial agreement or plea agreement in order "to ensure that [the] accused is making a fully informed decision as to whether or not to plead guilty." *Id.* (citing *United States v. King*, 3 M.J. 458, 458–59 (C.M.A. 1977)).

In 2016, R.C.M. 907 was amended to state that failure to state an offense is a waivable ground for a motion to dismiss. R.C.M. 907(b)(2)(E).[8] Rule for Courts-Martial 910(j) states that a plea of guilty waives any waivable objection. *See also United States v. Seeto*, No. ACM 39247 (reh), 2021 CCA LEXIS 185, *24 (A.F. Ct. Crim. App. 21 Apr. 2021) (unpub. op.), *pet. den'd*, No. 21-0284, ___ M.J. ___, 2021 CAAF LEXIS 722 (C.A.A.F. 3 Aug. 2021) ("The failure of a specification to state an offense is a nonjurisdictional, waivable basis for a motion to dismiss."). "A valid waiver leaves no error for [courts] to correct on appeal." *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020).

**3. Analysis**

### a. Failure to State an Offense – Attempted Conspiracies to Commit Murder

The crux of Appellant's argument regarding the two attempted conspiracy charges is that they fail to state an offense because "statutory developments have vitiated the basis for attempted conspiracy," and Appellant "did not waive this issue because the military judge misstated the law" when he said failure to state an offense is not a waivable issue.

Appellant believes that *United States v. Riddle*, 44 M.J. 282, 285 (C.A.A.F. 1996), which recognized that attempted conspiracy was a viable offense under the UCMJ, is now overruled by a 2016 change to Article 82, UCMJ, 10 U.S.C. § 882, arguing, "Congress modified the solicitation offense under Article 82 to become a general solicitation statute, rather than one focused on specific of-

---

[8] Exec. Order 13,730, 81 Fed. Reg. 33331, 33336 (20 May 2016).

fenses." Appellant argues that "revisions to the solicitation statute have undercut the rationale such that [*Riddle*] no longer has force" and *Riddle* is now superseded by statute; thus, according to Appellant, attempted conspiracy is a no longer an offense under the UCMJ.

During the plea agreement discussion, the military judge did misstate the current state of the law. Specifically, the military judge misstated that failure to state an offense could not be waived. As such, Appellant believes that the military judge's error means that Appellant's "acceptance of that provision of the plea agreement could not encompass the failure to state an offense" and that she "could not have intentionally relinquished her right because the military judge misstated the law."

We find that the military judge committed clear and obvious error in providing this instruction. Assuming for purposes of analysis that Appellant waived this issue, the United States Court of Appeals for the Armed Forces (CAAF) has made clear that the Courts of Criminal Appeals have discretion, in the exercise of their authority under Article 66, UCMJ, 10 U.S.C. § 866, to determine whether to apply waiver or forfeiture in a particular case, or to pierce waiver or forfeiture in order to correct a legal error. *See, e.g.*, *United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018) (quoting *United States v. Quiroz*, 55 M.J. 334 (C.A.A.F. 2001)); *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016). Thus, even if Appellant waived this issue, this court must determine whether an error exists that merits piercing her waiver. *See Hardy*, 77 M.J. at 443.

Based on our review of the record and the error alleged, we have decided to pierce Appellant's waiver and assess for prejudice. Appellant's counsel did not object to, or challenge, the military judge's explanation. In her plea agreement, Appellant waived all motions, and based on the plea agreement inquiry, we assume her defense counsel advised her of the effect of this provision. She acknowledged she had been provided enough time to discuss her plea agreement with her defense counsel, that she entered into the agreement of her own free will, that no one forced her to make the plea agreement, that she fully consulted with her counsel and received the full benefit of their advice, and that she was satisfied with her defense counsel and that their advice was in her best interest. Accordingly, the military judge accepted Appellant's guilty pleas, and as for the attempted conspiracy related to TL, accepted her guilty plea as modified by exceptions.

Additionally, we find the specifications at issue did state an offense. There is no indication through the recent changes in the law that charging attempted conspiracy is now prohibited under Article 80, 10 U.S.C. § 880, UCMJ. Appellant would have us conclude that attempted conspiracy is no longer a viable offense under Article 80, UCMJ, based upon changes made to Article 82,

UCMJ, which criminalizes solicitation. We find this argument unavailing because no similar change was made to Article 81, UCMJ, the crime of conspiracy, which was the "target" offense of Appellant's attempted conspiracy charge. Further, reviewing the facts of this case, attempted conspiracy or solicitation were both viable charging mechanisms to capture Appellant's alleged crimes. The Government notes, and we agree, that "[o]ur rules should not be so rigidly drawn that prosecutors are placed in a dilemma in determining what offense should be charged." *See United States v. Anzalone*, 43 M.J. 322, 325 (C.A.A.F. 1995). Taking into consideration all of these facts, we find that the erroneous instruction did not substantially influence the findings or sentence in this case and that Appellant suffered no prejudice.

### b. Providency of Appellant's Pleas

We also find that the military judge did not abuse his discretion in accepting Appellant's pleas to attempted conspiracy. Specifically, Appellant believes she "failed to perform a substantial step in the 'conspiracy' with TL." We disagree, as the record shows that Appellant performed substantial steps towards the commission of these offenses.

As to the factual basis for Appellant's plea, Appellant agreed to a plea agreement, and the Government introduced Prosecution Exhibit 1, a lengthy, 21-page stipulation of fact consisting of 121 paragraphs. Appellant also agreed to not object to the admission of 12 prosecution exhibits, all of which supported the facts of the stipulation. These exhibits included Appellant's text and Facebook messages with JM and TL and her interview with AFOSI. One of the exhibits contained pictures of Appellant at the Walmart in Ruston, LA, purchasing what she thought was fentanyl. The stipulation recited the elements of each crime and factual circumstances of each offense, and included every factual assertion in the specification to which Appellant pleaded guilty. The military judge read most of the narrative portion of the stipulation aloud to Appellant, and secured Appellant's agreement that it was all true and that Appellant wished to admit it was true. In addition, after the military judge explained the elements of each offense to Appellant, the military judge had Appellant explain in her own words why she was guilty of each offense; Appellant did so, articulating how she performed substantial steps in the attempted conspiracies, as previously addressed. The military judge asked follow-on questions to ensure Appellant agreed the elements of each offense had been established, that Appellant agreed her actions were intentional and unlawful under the circumstances, and that counsel for both parties agreed no further inquiry was required. Specifically related to TL, Appellant admitted to calling him multiple times in a three-day span shortly before she intended on killing TD. In fact, based on Appellant's inquiry, the military judge found her not guilty of

a portion of the specification related to TL. Having reviewed Appellant's providence inquiry, along with her agreed-upon stipulation of fact, we are satisfied Appellant's pleas of attempted conspiracies with respect to JM and TL are provident.

In summary, the military judge's inquiry regarding the providence of Appellant's guilty pleas was thorough. At no point did Appellant express a mistaken belief that any motion she had raised or wanted to raise would be preserved following her guilty pleas, that she was otherwise confused or mistaken about the effect of her plea agreement and guilty plea, or that her plea was less than fully informed, voluntary, and factually accurate. Finding no substantial basis in law or fact to question Appellant's guilty plea appearing in the record of the court-martial proceedings, we find the military judge did not abuse his discretion by finding Appellant guilty of these two specifications of attempted conspiracy to commit premeditated murder.

## B. Sentence Appropriateness

### 1. Law

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our authority to determine sentence appropriateness, "which reflects the unique history and attributes of the military justice system, includes but is not limited to considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omitted). Although we have great discretion to determine whether a sentence is appropriate, we have no power to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

### 2. Analysis

When Appellant was detained by AFOSI, she had been discussing and planning the murder of TD for over two months. She inquired about hitmen, wanted lessons on how to poison her husband, and solicited a co-worker to kill him. Ultimately she drove an hour away to purchase what she thought was fentanyl and stored it in her freezer until the time was right to poison her husband by way of a drink. She then planned to depart the area for Christmas, in the hopes that her husband would die while she was out of town. The reward for her

efforts would be the sole custody of her child and the proceeds from her husband's life insurance policy.

In her brief, Appellant appears to be raising for the first time, that shortly after she purchased what she believed was fentanyl, she decided to dispose of the drug and abandon her plan to kill TD. In making this "possible abandonment" claim, she points to her videotaped interview with AFOSI, which occurred hours after she made the buy. However, her claims of any "possible abandonment" is at odds with her providence inquiry and the voluminous stipulation of fact, in which voluntary abandonment is never discussed or raised. As the Government notes, "Except for actually placing the substance in [TD]'s drink and giving it to him, Appellant took every step possible to kill [TD]." We agree. Despite her assertion that she intended to abandon her plan, only disclosed during her interview with AFOSI, the record shows that but for AFOSI showing up at her residence, Appellant intended all along on killing her husband. A key inflection point occurred when her co-worker JJ told Appellant he intended to contact local authorities to advise them of Appellant's activities. When JJ told Appellant he was going to alert local authorities, Appellant did not respond that she would stop and abandon her plan. Her response was simply, "Oh wow. That's a real change in position. I won't talk to you anymore then." After the local Sheriff's Office contacted Appellant, Appellant did not abandon her plan; she continued developing her plan to kill her husband. Even when Appellant was on notice that law enforcement was aware of her intent to murder her husband, the mere fact she was still willing to "take lessons" and purchase what she thought was fentanyl to kill TD, is quite indicative that Appellant was taking substantial steps to see her plan through.

In light of the Government's possession of highly incriminating text messages, Facebook messages, and Appellant's own words, Appellant entered into a favorable plea agreement, binding the military judge to sentence her to no more than ten years of confinement, when, had she litigated her case, she could have received confinement for life without the possibility of parole. Although Appellant received the maximum allowed confinement per the plea agreement, avoiding the possibility of a much longer sentence is an advantage that renders Appellant's willingness to enter into the plea agreement all the more logical. Appellant's argument that her sentence is inappropriately severe is more in the nature of a request for clemency than an appeal of sentence severity. Having considered Appellant, the nature and seriousness of her admitted offenses, and all matters contained in the record of trial, to include all matters Appellant submitted in her case in extenuation, and mitigation, we conclude the sentence is not inappropriate.[9]

---

[9] Appellant did not submit matters in clemency.

### III. CONCLUSION

The findings and sentence entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court